Good morning, your honors. David Barnfine is my name. I represent Damian Phillips in this matter. I'm asking this court respectfully to reverse the decision of the trial court, finding that Mr. Phillips didn't have standing at the summary judgment phase. I'll begin with a brief commentary on the dominion and control test. I believe that this test should be limited to matters that pertain to real property and automobiles. The reason for this, your honors, is as this court pointed out in the United States v. Morgan case, the intent of Congress in passing section 853, which is admittedly a criminal forfeiture case, the congressional intent, as the court stated in Morgan, was to prevent third party nominees from engaging in a sham or fraudulent transaction. Why don't you begin by telling us exactly what connection Mr. Damian Phillips has to this currency? He has always been very consistent, your honor, that it is his currency. What's that? He's always been consistent from the time of seizure to the present that it's been his currency and his currency alone. Moreover, his brother, who's the lessee, if you will, of the storage locker, unequivocally states that he gave his brother access to the storage facility in order to deposit his property, as I believe he was moving from North Carolina to Virginia to engage in teaching employment. That was submitted not only in his claim, that certainly discovery reflects that unequivocal testimony, and Byron Phillips signs an affidavit clearly stating that to be the case. Now, I have found, and I discussed this notion in my reply brief, that when courts are faced with a scenario where there's been consistent testimony and some other evidence of ownership put forward, that that is sufficient at the summary judgment stage. Well, you have the two brothers basically just boldly declaring the same thing. The $100,000 is discovered in the locker. And, of course, if it's related to drugs, it's gone. If the other brother, it belongs to the other brother, they both can have it or the other brother can have it or whatever. There's nothing else really other than the bold declaration. And not only that, you have the two circumstances that go the other way. One is the circumstances of the money among the drug paraphernalia and the residue and that type of thing. And the second thing is the numbers don't add up. He claims he saved it. And if you add up every number, he still wouldn't have enough money. If he saved every single penny over and above the expenses he listed, and he didn't list them all, for instance, he didn't list the $600 monthly payments for the Mercedes and this type of thing. But to everything he listed in his affidavits you listed, he still saved every penny. He still couldn't have gotten $200,000. And so to me, it's so attenuated. I mean, it's just an assertion. That's my money, despite the fact that it's in somebody else's locker. It's wrapped in cellophane. It's $200,000. It's related. It's got drug paraphernalia around it. It's so opportunistic for him just to make that statement. And, Judge, I would respond by saying that the wrapping of the money is evidence more appropriate or more probative towards the underlying claim as opposed to Article 3 standing. I agree with Judge Niemeyer. I added all the math up. And if you take all of his expenses versus what his say his income was, he's at minus $18,000. Not that he has saved this money, but he's at minus $18,000. And, Your Honor, I would point out that many of the- That's based on his testimony. I understand. And many of these years, tax years are many years ago. Tax returns are no longer available. He did state under oath what his base salary was with the NFL. He did submit to the court- I'm giving him the benefit of all that. Well, he had tax returns for those years. Some of the years. Some of the years. Yeah, yeah. And he just stated basically what the presumptive base level was. He didn't say what he was making. He didn't say what his status was in those situations. I mean, and then you had tax returns for some of those years where he had them, and he just wasn't basically making any money. But if you add up the numbers, I did exactly what Judge Motz did. It is literally impossible for him to have saved $200,000. And then you say he started saving it in cash in 2009 because he didn't trust the banks. And yet you have nothing before 2009. You can count anything to suggest he was saving any money anywhere. It is so thin. In other words, you come away and you speak to a person on the street and say, could this guy have saved $200,000 in cash with a situation where his cars were foreclosed on, he didn't have money, he lived at home, had few expenses, had little income, and he was saving every penny, and he still can't get to $200,000. I think giving Mr. Phillips the benefit of the doubt in the judgment stage and admitting for purposes of argument, for any purpose, that there are not tax returns for every single year. And there's not a tax return available for tax year 2003. But you've got to have some evidence. And if one of the years where we don't have any data, he doesn't say how much he made for some of those years. I mean, it's just a blank. And so you would have to hypothesize that he made six figures or something in that one year when the history was he was barely making any money anywhere. His biggest year was what, $40,000 in 2008? No, that was a savings, $60,000. We're not supposed to hypothesize tax fraud, are we? Absolutely not, Judge. But I think it's fair to give him the benefit of the doubt when you have someone in the NFL, which is not disputed, we don't have a tax return for that year 2003 because it's been destroyed. Suppose you do have $40,000 in income. How likely is it that someone would want to convert all that to cash and put it in someone else's self-storage unit? I mean, normally you would expect that to be in a bank account or you would expect some of that to be spent. But I mean, how likely is it that a sum of that size would be converted into cash and put in a self-storage unit? That's just not the way people manage legitimate finances. Judge Wilkinson, I would agree that is not the way I manage my finances. I think justice in this case would invite the understanding or appreciation that certain people conduct their affairs differently. Some people are distrustful of the government. Well, normally the folks that engage in this type of financing, very often it's illicit. The explanation for the $200,000, didn't it have to do with a contract that he had signed with the Buffalo Bills? Our contention is the vast majority of the currency in question was actually earned during that tax year 2000. But it was a pro-football contract, is that right? That's correct, Your Honor. Okay, Ned, was there any evidence of that contract ever put forward? Was the contract itself put forward? Did the Buffalo Bills ever attest to that contract? There's no contract in discovery. Is there a letter from the Buffalo Bills? There is a settlement check from the NFL. Mr. Phelps subsequently became disabled. I believe it's from the NFL. But that clearly shows that he was employed in that capacity. I believe that settlement check was for over $40,000. Now, does that get you to $200,000? No, but I think in viewing the evidence most favorably to Mr. Phelps, you have some blanks, and you certainly have an undisputed contention that he played in the NFL. I guess my problem is I didn't see the kind of backup documentation of any of this. The lease agreement for the self-storage unit on Byron's lease agreement, there's no mention of Damien's right of access or co-ownership or whatever. There's just no documentary evidence of a right, a co-ownership interest or a possessory interest or whatever. So we're sort of left with these conclusory statements from two family members, each of whom I suspect has a considerable self-interest in bolstering the case of the other to the cash. That can't be enough. That happens all the time. I think, Your Honor, and I appreciate your comments, obviously, I think you have to look at the context that we're dealing with. This is not a situation where the currency was seized in the car. It was seized from the storage locker, and no one was present. And the trial court is quick to point out, well, Mr. Phelps wasn't present when the money was seized. Well, of course he wasn't. And so while Mr. Phelps, Damien Phelps, isn't on the lease itself, there's no contradiction in the evidence, or there's nothing to contradict what Byron Phelps is saying. And to be honest, most courts have determined that when there's been consistent testimony about ownership and then some other evidence set forth, and we're talking about the summary judgment stage, and I understand the inquiry continues through the trial verdict period. Well, this only gets him standing. Not only does the summary judgment only get him standing. And I have some sympathy with the less difficult test, but I couldn't find a case that had facts like these where his evidence adds up to a minus number. So it would have been impossible if you accept every single piece of evidence that he put in. Your Honor, I'm not sure. I would categorize the evidence for as incomplete evidence. Well, what is your strongest case that has evidence as skimpy as the evidence here? Skimpy is my word. In other words, the evidence that would be least favorable to the claimant, but still there was standing found. I couldn't find one that was the parallel of this one at all. And, Your Honor, I would argue that these cases are very fact specific necessarily. I do think going back to the own case and in my reply brief, I tried to kind of summarize or do a summation of my colleagues' recitation of the case law. And I found in every one of those cases consistent testimony and then some evidence, and that is sufficient under Article 3. It's the some evidence point that trips you up. I'm sorry? It's the some evidence point that's problematic for you. There's just no documentary backup. And if we were to adopt your rule, we would just be saying conclusory affidavits from family members. Contradicted by your own evidence with respect to the amount of money you had. You would establish standing in that, you know. That's really sort of the, I mean, it has to be some common sense in this somewhere. I mean, it can't come before us and expect us to be infinitely gullible. At any rate, you have some rebuttal time. We'll hear from you then. Thank you, Your Honor. Mr. Baker. May it please the Court. My name is Steve Baker. I represent the United States of America. Your Honors, before I proceed with my comments today, I wanted to correct one item that was mentioned by counsel for Mr. Phillips. He said that there was no tax information for the year 2003, the year that Mr. Phillips claims to have played for the NFL. There is no tax return. There is, however, an IRS account transcript, and that's on the record in the Joint Appendix at page 34. And what that shows is that Mr. Phillips filed a tax return in March of 2004 for tax year 2003, in which he reported earnings of $20,257. And so what counsel for Mr. Phillips just said is that his claim to the cash is that he earned most of it playing for the NFL in 2003 for the Buffalo Bills. As the Court has correctly pointed out, there's no documentary evidence of any arrangements with the NFL or with the Arena Football League. And how did he come on this sizable amount of currency? Your Honor, the evidence… He didn't come on it. It's drug money. And his brother has a history of drug dealing. Yes, Your Honor. The evidence before the district court was undisputed. There were repeated alerts by a narcotics detection canine to the storage unit, to the cash itself. The storage unit also contained two digital scales. The $200,000 even was in 12 vacuum-sealed bags. And there's never been an explanation for Mr. Phillips of why he would maintain his cash this way, in 12 vacuum-sealed bags. But how did he come by it? I mean, how does he say he got it? He says he earned it playing for the NFL, the Arena Football League, and for various employers. But there's no evidence of that. No, Your Honor. Not only is there no evidence of that, the evidence in the record actually disputes every claim he has of having earned money. And the Court referenced one year in which he made $60,000. That was in 2008. That's in the record at page 41. But that year he had business expenses of $50,000. So even crediting, and by the way, he claimed that. When I added those up, I assumed that the business records were automobile depreciation. And so I gave him credit for all of that. And I still came up short. I did use those numbers that the IRS gave for 2003. I mean, if you look at his affidavit, he says what the base salary was for 2003. But then the IRS reports that it was $20,000 for 2003, $15,000 for 2004. I mean, this is a guy that had two foreclosures on his car. He had to turn his car back to his father, not making payments. He's just living from hand to mouth. And I'd like to see anyone who has saved $200,000 in cash in that kind of financial circumstance. I mean, it just defies common sense. Yes, Your Honor. And all these facts were before the district court. They were provided to the district court. The district court cited them, both his modest income and his financial hardships. And in determining that he did not have standing because he could not show ownership, the district court cited all these facts. And these facts, the documentary facts, the numbers we're talking about now, have not been disputed by Mr. Phillips. He does claim a potential base salary, but he is never in response. But he didn't make it for some reason or other. He may have been a reserve. He may have been injured. He may have been out. You don't know why his income was $20,000 for that year. And there was another number he gave. But the record shows the only evidence we have is for 2003 is $20,000. Yes, Your Honor. That's absolutely correct. And so on the point of standing, regardless of which test is used, the district court used the colorable interest test, pointing out in a footnote the uncertainty regarding the dominion and control test. The government's position is that regardless of the different tests, or it would seem to me that a colorable interest would be dominion and control. Your Honor, those two phrases, colorable interest and dominion and control, are used in the case law sometimes in the same context, sometimes in different contexts. It is somewhat difficult to tell. What's the difference in those two formulations? The difference would be that under colorable interest, the colorable has been described as meaning plausible. And so you determine whether a person has a colorable or a plausible ownership interest. And that's a wide-ranging inquiry, fact-specific, wide-ranging. The dominion and control test goes further than that. Once you determine whether that interest exists, then you determine if it was set up to be a nominee interest. In other words, if this person who has title to a piece of real property, for example. Could Byron have conferred upon his brother a colorable interest even if Damien did not accumulate that amount himself? It's difficult to see how, Your Honor, in the absence of that. I don't think that's the case we have here, but I'm just interested in the degree to which one family member could confer a colorable interest on another family member, even if the family member didn't have the, you know, even if it wasn't money that the family member had himself earned. And I suspect the answer to that is yes, that just as we can bequeath money to our descendants, one could gift money or gift currency to a brother. So, Byron. There's no assertion of that here, right? Your Honor, there is no assertion of that. That was asserted in one of the cases the government cited in its brief from the Western District of Virginia. And the court there found that the claimant had not proven that gift under the state law that was applicable there. So not only, as the court's pointed out, has there been no assertion of a gift or a bailment or any of these other possible options that might exist, but then it hasn't been proven. So it hasn't been asserted or proven with any record evidence to the satisfaction of North Carolina law where this money was seized. So you get back to the point that we were talking about earlier, which is there's no documentary evidence for any of the assertions. Yes, Your Honor, that's correct. For both of the district court's holdings, for the standing holding, for the forfeitability on the merits holding, there is no documentary evidence in support of Mr. Phillips' position. The undisputed record. Well, it's actually a little bit more favorable to you because not only is there no evidence, it looks like the evidence that he provided provides to the contrary. It's contradicted by all the facts, Your Honor. And it's implausible. He says, for instance, he says, my settlement with the football team was $50,000, and yet the check was $40,000. He says that the potential income, base income for the Bills was $225,000. Well, I'm assuming that takes him all the way through the playoffs. He achieved all kinds of incentives and so forth like this, but yet the IRS discloses that he received $20,000 that year. The inherent contradiction, I mean, the idea is that it's, you wonder whether he is deliberately fabricating all of this, which would, of course, raise even more serious problems for him. But it's certainly not an absence of that. It's evidence to the contrary. Yes, Your Honor, that is correct. And it was his burden. And that's an important point, is that it is the claimant's burden to put forth evidence to establish standing. And as Your Honor has pointed out, not only did he not put forth evidence in support of his assertions, but the evidence gathered in discovery by the government, submitted to the district court, contradicts those assertions point by point. But our point to you, which you don't seem to be able to, or you don't seem interested in grasping, but is telling to me, is you don't have to worry about the government's evidence, but look at his evidence. And you just take everything he said is true with respect to his earnings, and it still doesn't add up to being able to save $200,000. Yes, Your Honor, that's absolutely correct. And especially given his burden to establish standing, that is the critical point. And the district court determined that he did not meet his burden and correctly applied the summary judgment standard. And the government would respectfully request that the district court be affirmed on the standing point and, of course, on the second holding, as well as to the merits of the substantive forfeitability. All right. Is that it? Yes, Your Honor, unless the court has any further questions.  Paul. No, I'm finished. All right. Thank you. Thank you, Your Honors, for the opportunity to be heard once again. I wanted to briefly follow up with some of the evidence that the court considered and, in my opinion, did not construe it in the light most favorable to Mr. Phillips. For instance, the court points out that his, it wasn't even his wife, Omega Phillips, before they were married, filed bankruptcy and took that or made the assumption without hearing evidence, without conducting an evidentiary hearing, that, well, of course Mr. Phillips wouldn't have a lump sum amount of money because his wife had declared bankruptcy. I think that's an unfair assumption on the trial court's part. I think it is construing evidence not in the light most favorable to Mr. Phillips, quite to the contrary. I think modern day times show that people declare bankruptcy for all kinds of reasons. Some people declare bankruptcy because they don't have two pennies to rub together. What year was that that she declared? 2014? I believe it was 2012. Okay, fair enough. Certainly people declare bankruptcy for business purposes. You're just relying on maybe the district court went a step too far, but we can affirm on any basis, right? And so if we just look at what he said, just giving him the benefit of everything he said is, I think, where our problem is. And, Your Honor, of course that's accurate. If you look at the district court's holding and the rationale behind it, it doesn't focus at all on his financial means and what income was reported in what tax year. It was a lot of, well, his credit report listed a deficiency. Well, clearly he doesn't have a lump sum payment. Well, failure to pay a bill isn't evidence of anything, particularly at the summary judgment stage. He might have tons of money and for whatever reason declined to pay a bill. He applied for and received unemployment benefits. Well, who wouldn't if they were thrown out of a job? Well, he also had two cars that he couldn't make payments or foreclosed. I mean, it starts to add up. This man, not only does he fail to advance the evidence that supports his position, but the evidence that's in the record shows that he couldn't. I mean, it gives you a certain amount of confidence in the conclusion that there will not be the evidence. You ask us to give him the benefit of the doubt, but we can't. In giving him the benefit of the doubt, we can't supply evidence. We can only take the evidence he has and accept it. And when we accept it, it is inherently contradictory. Your Honor, I think it's incomplete evidence. But how do we supply the rest? In other words, it's incomplete. Just take the one point. For 2003, you say the potential base salary, that's the greatest amount a person in his position could have received under the contract, was $225,000. You don't say what he earned. Now, you know those contracts are filled with incentives. They go to the playoffs, go to the Super Bowl, whatever. They get a lot of additional monies for achieving those levels. And they're also personal incentives. So the IRS puts, there's an absence of evidence there. We don't know what he made in that year. Now, if you're looking behind that, it's not just an absence. We have to just rely on the absence of it. But it turns out that the IRS reported that he only made $20,000 in those years. So the question is, okay, give you $20,000, even though you only had zero because you didn't put anything in. That doesn't help you. It doesn't advance the ball. I added those numbers in, giving you the benefit of extra income, just to see if you could make the numbers work. And they don't work. And so you take his numbers. We don't need to go to the benefit. Just take his numbers, as Judge Motz pointed out. Take his evidence. It's implausible. Not only implausible, impossible. And then you get to the context where we have $200,000 in cash wrapped in vacuum bags among drug paraphernalia and tainted with drug residue in a locker to his brother, who has been convicted of drugs several times. And the question is whether you have demonstrated enough to get standing to make a claim to that money. May I respond? Of course. And, Judge, your point is certainly well taken. There are a handful of years there's no tax return filed whatsoever, if you look over the last 15 years. And so we don't know what numbers to insert into those years. There are tax years where the tax returns are unavailable. We don't know for sure. And I understand in some of the years the IRS is able to produce a transcript. It is what it is. But there are other years. It's just an incomplete picture. And so I would argue to this Court, based on the incomplete evidence, we give Mr. Phillips the benefit of the doubt at the summary judgment stage. Now, that might be very different at trial. And if you look, quite frankly, at the evidence that the district court relied upon in finding no Article III standing, I would suggest that not only was it not construed in Mr. Phillips' interest, to the contrary, it was construed very much against him. All right. Thank you, sir. Thank you. We will come down and greet counsel and proceed directly into our next case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Diana Gribbon Motz